**EXHIBIT H**

Gerling's Rendering of the Proposed Mobile Medical Trailer.

[deleted]

**Rosa D. BONEWELL, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Carmen Titong–Bonewell, Defendant–Intervenor.**

**No. 08–745C.**

United States Court of Federal Claims.

Nov. 4, 2010.

Chester H. Morgan, II, Colorado Springs, CO, for plaintiff.

John S. Groat, United States Department of Justice, Washington, DC, for defendant.

Terry L. Elling, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

SWEENEY, Judge.

In this case, plaintiff Rosa D. Bonewell, as the former spouse of a deceased United States Air Force ("Air Force") retiree, claims that she is entitled to annuity payments through the military's Survivor Benefit Plan ("SBP"). Defendant and defendant-intervenor, Carmen Titong–Bonewell, the retiree's widow, move to dismiss plaintiff's complaint for failure to state a claim upon which this court can grant relief. Alternatively, they move for judgment on the administrative record. Plaintiff cross-moves for judgment on the administrative record. For the reasons set forth below, the court denies the parties' motions.

## I. BACKGROUND[1]

The SBP was enacted by Congress in 1972 to provide benefits to surviving spouses and

---

1. The court derives the facts in this section from plaintiff's complaint ("Compl."), the exhibits attached to the complaint ("Compl. Ex."), and the portion of the joint appendix ("JA") constituting the record before the Air Force Board for Correction of Military Records ("AFBCMR"). Any

dependent children of deceased military retirees. Act of Sept. 21, 1972, Pub.L. No. 92–425, 86 Stat. 706 (codified as amended at 10 U.S.C. §§ 1447–1455 (2000)).[2] In 1982, Congress expanded the list of potential SBP beneficiaries to include former spouses. *See* Uniformed Services Former Spouses' Protection Act, Pub.L. No. 97–252, § 1003, 86 Stat. 706, 735–36 (1982). A service member who is married or has dependent children at retirement is automatically enrolled in the SBP unless he or she affirmatively elects not to participate. 10 U.S.C. § 1448(a)(2). The retired pay of SBP participants is reduced in accordance with the type and number of designated beneficiaries. *Id.* § 1452. Upon the death of an SBP participant, his or her beneficiaries receive monthly annuity payments. *Id.* § 1450(a).

On July 6, 1968, plaintiff married Technical Sergeant Rodney L. Bonewell ("TSgt Bonewell") in the Republic of the Philippines, where TSgt Bonewell was stationed with the Air Force. Compl. ¶ 6; JA 12, 50. During the course of their thirty-two-year marriage, plaintiff and TSgt Bonewell had two children: a son and a daughter. JA 98. TSgt Bonewell retired from active duty on August 1, 1984, after twenty years of service. *Id.;* Compl. ¶ 6. Upon his retirement, TSgt Bonewell elected to participate in the SBP, providing coverage for his children, but not plain-

tiff. JA 29, 32. Subsequently, on March 31, 1993, TSgt Bonewell elected to provide coverage for both plaintiff and their children. *Id.* at 98–100. His retired pay was reduced accordingly. Compl. ¶ 6.

Plaintiff and TSgt Bonewell legally separated on October 27, 2000. JA 15–18. Then, on May 10, 2001, they filed a *pro se* petition to dissolve their marriage. *Id.* at 13–14. The Decree of Dissolution, which incorporated the prior separation agreement, was issued by the El Paso County, Colorado District Court on May 11, 2001. *Id.* Paragraph eight of the separation agreement provided: "The pension and retirement accounts will be divided as follows: Wife shall receive $472.54 per month of Husband's Air Force Retirement and SSP [sic] benefits." *Id.* at 16. Accordingly, on May 16, 2001, TSgt Bonewell submitted DD Form 2558, Authorization to Start, Stop or Change an Allotment, to the Defense Finance and Accounting Service ("DFAS"), requesting that plaintiff receive a monthly allotment of $472.54 from his retired pay. *Id.* at 95. On the form, TSgt Bonewell indicated that the allotment was being made pursuant to a "court ordered divorce settlement," [3] *id.,* and the evidence reflects that TSgt Bonewell submitted a portion of the Decree of Dissolution with his DD Form 2558.[4] Specifically, it is clear that TSgt

facts derived solely from the complaint or the exhibits attached to the complaint will be considered by the court only when ruling on defendant's motion to dismiss. *See Walls v. United States,* 582 F.3d 1358, 1368 (Fed.Cir.2009) (indicating that "review of a military corrections board is limited to the administrative record").

2. Unless otherwise stated, all citations to 10 U.S.C. §§ 1447–1455 are to the 2000 version of the United States Code, the law in effect when the relevant events in this case occurred.

3. Despite this notation suggesting that he was no longer married, TSgt Bonewell's retired pay continued to reflect a deduction for SBP spouse coverage. JA 67.

4. There is evidence to the contrary. The Air Force has claimed, in contrast to its February 9, 2004 position, that "[a]lthough the allotment request form acknowledges the divorce decree, [it] has no basis to know whether [TSgt] Bonewell submitted a full or partial copy of his divorce decree and separation agreement along with the allotment authorization." JA 93 (containing a

July 31, 2006 advisory opinion from the DFAS). According to the DFAS:

> [T]he copy of the member's DD 2558 ... was entered into DFAS'[s] computerized records on July 3, 2003, and was copied into the pay system along with two random pages from [the] divorce proceedings in Colorado.... We have no basis to know whether these two pages from different parts of [the] divorce proceeding were submitted by the member along with the original allotment authorization or why these documents were imaged into the record over two years after the allotment form was executed.

*Id.; accord id.* at 83 (containing a February 17, 2006 advisory opinion from the Office of the Judge Advocate General); *cf. id.* at 83 n. 7 (indicating that the DFAS informed the Office of the Judge Advocate General that the "May 2001 voluntary allotment form appears in the DFAS records 'only because someone submitted it to DFAS in July 2003'"). Although defendant recognized the conflicting nature of the evidence in its initial briefing on the instant motions, Def.'s Mot. 4 n. 2, it ultimately decided not to "contest

Bonewell attached to his DD Form 2558 a copy of the notice setting the final hearing on the dissolution and a copy of the page from the separation agreement containing paragraph eight. *Id.* at 95–97 (containing the three pages); *accord id.* at 32 (containing a February 9, 2004 advisory opinion from the Office of the Judge Advocate General indicating that TSgt Bonewell submitted the Decree of Dissolution/separation agreement to the DFAS); Compl. Ex. 1 at 28–30 (containing the three pages, each bearing the same unique identifier (*i.e.,* "LKY3070300375") and a consecutive page designation (*i.e.,* "Page 1 of 3," "Page 2 of 3," or "Page 3 of 3") along the top of the page); JA 97 (containing the page from the separation agreement on which paragraph eight has been highlighted). The DFAS processed the DD Form 2558 and plaintiff began receiving a monthly payment of $472.54. JA 93.

Although TSgt Bonewell reallocated a portion of his retired pay in conformance with the Decree of Dissolution, he did not make a separate, specific request to the DFAS to change his SBP coverage for plaintiff from "spouse" to "former spouse." *Id.* at 83, 92–94. Further, the DFAS has no record of plaintiff submitting a request that she be deemed a former spouse for SBP purposes. *Id.* at 83, 92. TSgt Bonewell subsequently married defendant-intervenor on August 13, 2001. *Id.* at 116. He did not notify the DFAS of his new marriage. Id. at 83, 94. Nor did he attempt to change his election from plaintiff to his new spouse as the proper recipient of the SBP annuity. *Id.*

TSgt Bonewell died on April 29, 2003. *Id.* at 19. Thereafter, on May 27, 2003, plaintiff submitted an application to receive the SBP annuity awarded to her pursuant to the De-cree of Dissolution, along with TSgt Bonewell's death certificate.[5] *Id.* at 83, 109–10. However, the DFAS denied plaintiff's application. In a June 19, 2003 letter, the London, Kentucky office of the DFAS indicated that the "[r]ecords on file at" that location showed that TSgt Bonewell "elected to participate in the [SBP] . . . for spouse and child coverage" and that because plaintiff was "not married to Mr. Bonewell at the time of his death," it was denying her application for the SBP annuity. *Id.* at 24. Consequently, when the DFAS received an application for the SBP annuity from TSgt Bonewell's widow in July 2003, appended to which was a copy of the Decree of Dissolution, it granted the application and began making monthly annuity payments to her.[6] *Id.* at 83, 116–17.

Plaintiff ultimately retained an attorney, who, in an October 2, 2003 letter to the DFAS, sought reconsideration of the June 19, 2003 denial. *Id.* at 22–23. The DFAS responded on October 6, 2003, as follows:

A spouse loses eligibility as an SBP beneficiary upon divorce. It is important to know that there is no provision in the SBP, which makes former spouse coverage an automatic benefit. The only means by which the divorced spouse may receive a survivorship annuity is if former spouse coverage is elected/deemed in writing within one year of divorce. A court order cannot, by itself, be used to institute coverage. The service member must submit a signed election request, before coverage can be established.

You divorced the member on May 11, 2001. The former spouse and the member had until May 11, 2002 to inform DFAS–Cleveland of the divorce and state your

that the three pages in question were apparently received by DFAS in May 2001," Def.'s Reply 24 n. 9. Given this representation, the court is concerned that at least two of the advisory opinions described below, *i.e.,* the Office of the Judge Advocate General's February 17, 2006 opinion and the DFAS's July 31, 2006 opinion, are based on a faulty premise—that the DFAS did not receive part of the Decree of Dissolution along with the DD Form 2558—and resulted in the denial of the benefit to plaintiff that TSgt Bonewell specifically agreed to and provided for in the Decree of Dissolution.

5. Plaintiff also submitted a claim for unpaid compensation. JA 111–12. In a June 14, 2003 letter, the Cleveland, Ohio office of the DFAS indicated that because the "[r]ecords on file at" that location showed that TSgt Bonewell "designated a beneficiary to receive unpaid compensation due upon his/her death," it was denying plaintiff's "claim for arrears. . . ." *Id.* at 108.

6. TSgt Bonewell's widow had previously called the DFAS to inquire about the SBP annuity on May 9, 2003. JA 83.

deemed election as former spouse to continue the SBP coverage.

> Our records do not reflect a written request from you or the service member within one year of your divorce date. Therefore, you are not an eligible beneficiary for SBP, effective May 11, 2001.

*Id.* at 25.

On November 14, 2003, plaintiff submitted an Application for Correction of Military Records to the AFBCMR in a further attempt to obtain the SBP annuity. *Id.* at 47–49. The AFBCMR returned the application to plaintiff on December 12, 2003, explaining that it could not "rule on a disputed claim to a benefit only one person can receive." *Id.* at 26. Dissatisfied with this response, on January 9, 2004, plaintiff entreated the Office of the Judge Advocate General directly for assistance. Compl. ¶ 10. As a result, the AFBCMR changed course and decided to consider plaintiff's application. *Id.*

The AFBCMR sought two advisory opinions. The first was prepared by the Air Force Personnel Center ("AFPC") on January 29, 2004. JA 67–68. It noted that the relevant law required an election or deemed election of former spouse coverage within one year of a divorce. *Id.* at 67. However, it found that there was "no evidence" that TSgt Bonewell requested that plaintiff's "SBP coverage be terminated following their divorce" and that "it would be inappropriate to deny her an asset the court intended she receive." *Id.* at 68. The AFPC recommended that although there was "no evidence of Air Force error in this case," TSgt Bonewell's military record should be corrected to reflect that on May 12, 2001, "he submitted a valid election for former spouse and child coverage based on full retired pay, naming [plaintiff] as the eligible beneficiary." *Id.*

The second advisory opinion was prepared by the Office of the Judge Advocate General on February 9, 2004. *Id.* at 63–65. After reiterating the applicable statutory law, it framed the relevant issue as "whether the filing of the divorce decree, which included the separation agreement awarding the applicant SBP benefits, with DFAS meets the statutory requirements of 'a written request, in such a manner as the Secretary shall prescribe … requesting that such an election be deemed to have been made,'" such that a deemed election of former spouse coverage could be established. *Id.* at 64 (quoting 10 U.S.C. § 1450(f)(3)(A)(i)). It concluded that based upon the plain statutory language, as reinforced by two decisions from the United States Court of Federal Claims ("Court of Federal Claims"), "the written request and court order are two different items and the latter does not incorporate the former." *Id.* at 64–65. Accordingly, the Office of the Judge Advocate General recommended the denial of plaintiff's application, noting that plaintiff's complaint was "with the estate of her former spouse and her only recourse [might] be to bring suit against the estate or the person now receiving the SBP annuity." *Id.* at 65.

Plaintiff responded to this latter advisory opinion on April 14, 2004. *Id.* at 36–38. In her response, she distinguished the cited Court of Federal Claims cases, disputed the suggestion of an available alternative remedy, and took issue with the lack of discussion of the AFBCMR's equitable powers. *Id.* In addition, she emphasized the extent to which an injustice had occurred in her case. *Id.* Ultimately, plaintiff concurred with the conclusion of the AFPC in the first advisory opinion that the interests of justice would be best served by correcting TSgt Bonewell's military record to reflect a timely election of former spouse coverage. *Id.* at 37–38.

The AFBCMR issued its decision on October 14, 2004. *Id.* at 5–9. After reviewing the underlying facts, the advisory opinions, and plaintiff's response to the advisory opinions, it concluded:

> Insufficient relevant evidence has been presented to demonstrate the existence of an error or an injustice. Through counsel the applicant essentially contends the submission of the divorce decree to the [DFAS] was sufficient to change the SBP spouse coverage to former spouse coverage. Counsel argues that by providing the divorce decree, which incorporated the separation agreement, within one year of its issuance[, she] satisfied the statutory "deemed election" written request required of former military spouses pursuant

to the law. However, after thoroughly reviewing the evidence of record and the applicant's submission, we agree with the opinion and recommendation of the ... Office of the Judge Advocate General, in his memorandum of February 9, 2004, on the subject, and adopt his rationale as the basis for our conclusion that the applicant has not been the victim of an error or injustice. Specifically, the Chief notes by the statute's plain wording, the written request and the court order are two different items and the latter does not incorporate the former. Therefore, in the absence of evidence to the contrary, we find no compelling basis to recommend granting the relief sought in this application.

*Id.* at 8–9.

Unsuccessful before the AFBCMR, plaintiff filed suit in the United States District Court for the District of Colorado ("district court") on July 19, 2005, seeking legal and equitable relief under the Little Tucker Act, 28 U.S.C. § 1346 (2000). JA 71–79. Plaintiff alleged that the AFBCMR's denial of her claim was arbitrary, capricious, an abuse of discretion, and without basis in law or fact. *Id.* After filing suit, plaintiff entered into settlement negotiations with Assistant United States Attorney Kurt Bohn, who was coordinating with the Office of the Judge Advocate General's litigation division, represented by Lieutenant Colonel Joseph Wendelberger. Compl. ¶ 14. Lieutenant Colonel Wendelberger suggested "that in view of recent cases coming from" the Court of Federal Claims, were plaintiff to "voluntarily dismiss her suit from district court[,] the AFBCMR would reconsider its earlier denial and [the Office of the Judge Advocate General] would recommend relief." *Id.* Based upon this representation, plaintiff voluntarily dismissed her complaint in district court. *Id.* ¶ 15; JA 69–70. The Stipulation for Dismissal indicated that the Air Force "agreed to reconsider" the AFBCMR's denial of plaintiff's application "in light of the recent case law," which took "into consideration the equitable factors overlooked or not applied in the AFBCMR's original decision." JA 69–70.

On November 23, 2005, plaintiff resubmitted her claim to the AFBCMR. *Id.* at 43–46.

The AFBCMR again solicited an advisory opinion from the Office of the Judge Advocate General, asking whether, in light of the new decisions from the Court of Federal Claims, the Office of the Judge Advocate General would amend the position set forth in its February 9, 2004 advisory opinion. *Id.* at 81. The Office of the Judge Advocate General issued its advisory opinion on February 17, 2006. *Id.* at 81–85. It determined, after consultation with the DFAS, that the facts of the case appeared to be different from what it believed to be the case two years previously. *Id.* at 82–84. Specifically, it rejected its previous belief that TSgt Bonewell had submitted a copy of some or all of the Decree of Dissolution with his DD Form 2558, instead asserting that it appeared that TSgt Bonewell's widow first submitted the "divorce paperwork" to the DFAS in July 2003 with her application to receive the SBP annuity. *Id.* at 83. Based upon this new information, the Office of the Judge Advocate General suggested that the appropriate inquiry was whether the AFBCMR should reconsider plaintiff's application "when the member submitted to DFAS a request for voluntary allotment to his former spouse referring to 'court ordered divorce settlement,' but not attaching the court order or mentioning the SBP benefits." *Id.* at 82. However, the Office of the Judge Advocate General did not formally answer this inquiry. Instead, it provided:

We believe that a discussion of the applicability of the two recent court cases to this case is premature until a better factual record is established. If [plaintiff] did not file any paperwork with DFAS until after her [ex-]husband's death, it seems to us that neither case would apply. Additionally, even if the requisite paperwork was filed, it now appears that there is another interested party in TSgt Bonewell's SBP. If that turns out to be the case, the Board should request an advisory opinion on the state of the law on the propriety of acting on the applicant's request.

*Id.* at 85. Thus, the Office of the Judge Advocate General recommended that the AFBCMR "reopen this matter to obtain an advisory opinion from DFAS to obtain documentary support for the additional facts

DFAS has provided this office and to establish a more accurate record upon which to base the Board's decision," and represented that once the facts had been more clearly established, it would "be happy to provide an opinion at that time on the state of the law concerning the various issues in this matter." *Id.* Plaintiff responded to this advisory opinion on March 24, 2006, arguing that (1) the AFBCMR was bound by the record considered in rendering its October 14, 2004 decision; (2) even if the new facts were true, the DFAS's unilateral changing of TSgt Bonewell's beneficiary was improper; and (3) the equities still remained with plaintiff. *Id.* at 87–91.

As suggested by the Office of the Judge Advocate General, the AFBCMR requested an advisory opinion from the DFAS, which the DFAS issued on July 31, 2006. *Id.* at 92–94. As alluded to in the Office of the Judge Advocate General's advisory opinion, the DFAS reevaluated the facts and determined that there was "no evidence that would substantiate [plaintiff]'s claim ... that the Decree of Dissolution and Separation Agreement were timely submitted to DFAS in order that she begin receiving her portion of [TSgt] Bonewell's retired pay." *Id.* at 93. Indeed, as noted above, the DFAS asserted that it had "no basis to know whether [TSgt] Bonewell submitted" any part of the Decree of Dissolution or the incorporated separation agreement prior to July 3, 2003, the date it contends that the DD Form 2558 and the two pages from the dissolution proceedings were entered into its computerized records. *Id.* After this supposed "clarifi[cation]" of the fact record,[7] the DFAS opined that the Court of Federal Claims decisions relied upon by plaintiff were distinguishable from plaintiff's case. *Id.* at 94.

In light of the DFAS's advisory opinion containing the putative "clarified" facts, the AFBCMR requested another advisory opinion from the Office of the Judge Advocate General. In its November 17, 2006 memorandum, the Office of the Judge Advocate General, incorporating its February 9, 2004, and February 17, 2006 advisory opinions, concluded that where a "former spouse wants her court-ordered SBP benefits, and the new spouse presumably believes she remains entitled to the SBP benefits," the AFBCMR was "not the proper forum...." *Id.* at 125. It explained:

> While the AFBCMR is expected to honor unambiguous court orders timely filed pursuant to federal law and may recognize undisputed court orders as evidence of member intent, its role is not to construe or enforce court orders, reconcile conflicting court orders and statutes, or decide, in effect, claims disputes between two or more private parties.

*Id.* at 13–14. Accordingly, it concluded that "[t]he AFBCMR should not consider cases involving disputed claims unless a court of competent jurisdiction has ruled in the case or requires the AFBCMR to make a determination in the case." *Id.* at 14.

On March 5, 2007, plaintiff provided the AFBCMR with an affidavit, and an affidavit of her son, "to shed light on what DFAS knew and when, and more specifically on the issue of substantial compliance...."[8] Compl. Ex. 1 at 9–10; *see also* Compl. Ex. 4 at 2–4 (containing the affidavits). In her affidavit, plaintiff stated:

> I believe then and now that DFAS had a copy of the divorce decree. In the first place, [TSgt Bonewell] told me that he had sent everything in. He assured me that I would get SBP, not just after the divorce,

7. The court notes that all of the "clarified" facts were known to the DFAS at the time that plaintiff first filed her application to correct TSgt Bonewell's military record with the AFBCMR. Moreover, plaintiff avers that she was not provided with the records supporting these "clarified" facts while the AFBCMR was first considering her application. Compl. ¶ 16.

8. These two affidavits were executed on March 2, 2007. Plaintiff had executed an earlier affidavit on March 15, 2006. With her later affidavit,

plaintiff intended "to correct errors in some of the dates in the previous affidavit ... and to supplement what [she knew] about what was done to ensure that DFAS was on notice about the divorce and the agreement that [she] was to get SBP." Compl. Ex. 4 at 2. There is no information in the record regarding when, or to whom, she submitted the original affidavit. *See* Compl. Ex. 1 at 9 (noting only that plaintiff's second affidavit "supplements and supersedes her earlier affidavit").

but again when we knew he was terminal and I was taking care of him, he repeatedly assured me that he had made sure I'd get SBP and that everything was in place.

Compl. Ex. 4 at 2. Plaintiff's son confirmed her recollection:

In November of 2002 [my father] stayed with me at my residence, and the topic came up. My dad told me that whatever happened he'd make sure that mom was cared for, and that she was already getting part of his military retired pay and that she'd get the Survivors Benefit Plan if he passed away. To the best of my recollection his specific words were "Your mother will be getting my Air Force retirement."....

.... [A]round February of 2003, when he knew that he was probably terminal, we talked about it again. My uncle, ... (my dad's brother), had been asking me whether my mom would be okay financially when my dad died.... Dad again repeated that there was nothing to worry about, that he had already taken care of everything.

*Id.* at 4. Neither of these affidavits was considered by the AFBCMR in ruling on plaintiff's application. *See* JA 171 (listing the exhibits considered by the AFBCMR); *see generally id.* at 1–172 (containing the administrative record, which does not include the affidavits).

On April 11, 2007, the AFBCMR forwarded to plaintiff two memoranda for review and comment. *Id.* at 128. The first memorandum was prepared by the Air Force Deputy General Counsel for National Security and Military Affairs on October 18, 2006, and contained "general guidance" concerning the AFBCMR's authority "to correct an error or remove an injustice in cases where there are competing interests for [SBP] benefits." *Id.* at 134. He explained:

In our view, as a general proposition, the AFBCMR has the authority to correct a record in an SBP case where it considers it necessary to do so to correct an error or remove an injustice. In such cases, "deemed" elections may not necessarily be outcome-determinative. Legal authority in this area must be determined on a case-by-case basis....

We have long maintained that the Board should exercise prudence when the consequence of correcting a record may be unfavorable to another person. While not a strict statutory prohibition, we nevertheless believe that in cases where there are possible competing interests, there should be a rebuttable presumption that no record correction should be made if the result would be unfavorable to another person eligible to seek relief from the [AF]BCMR.

In such circumstances, the Board must carefully weigh the equities of the competing interests (and we recommend each side be given the opportunity to comment). Only in the most extraordinary of circumstances, where the Board determines that equity demands a correction be made to remove an injustice, even though such a correction may be unfavorable to another person, should the Board make a correction.

*Id.* The second memorandum was an advisory opinion prepared by the Office of the Judge Advocate General on October 19, 2006, for another case before the AFBCMR. *Id.* at 129–33. In that case, the AFBCMR inquired whether a military record should be corrected to reflect SBP coverage for a former spouse despite the DFAS having established the service member's widow as the SBP beneficiary. *Id.* at 129. Based on the incomplete facts it was provided, the Office of the Judge Advocate General presumed that neither the service member nor the former spouse "made a proper former spouse SBP election within a year" of the court order directing the member to make the election, thus making the widow the "lawful SBP beneficiary" by operation of law. *Id.* at 131. Based on this presumption, the Office of the Judge Advocate General concluded that because the widow had "a vested interest in the SBP," the former spouse could not "summarily take away her lawful designation as an SBP beneficiary by seeking a correction of the member's military records." *Id.* at 131–32. Moreover, it reiterated its contention that the AFBCMR was not the proper forum to resolve such a contested case. *Id.* at 132. Ultimately, the Office of the Judge Advocate General perceived no error or in-

justice that could be corrected by the AFBCMR and suggested that the former spouse's recourse existed elsewhere. *Id.*

The AFBCMR forwarded one final submission to plaintiff for her review and comment on June 6, 2007: a May 1, 2007 letter, with attachments, from TSgt Bonewell's widow. *Id.* at 166; *see also id.* at 152–65 (containing the letter and attachments). In her letter, TSgt Bonewell's widow indicated that it was her position that she was the proper SBP beneficiary because the necessary paperwork on plaintiff's behalf was not submitted to the DFAS within the one-year time limit. *Id.* at 152, 154. Based upon this letter, the AFBCMR "encouraged settlement" between plaintiff and TSgt Bonewell's widow, but TSgt Bonewell's widow "did not reply to Plaintiff's repeated efforts to contact her by mail and by e-mail." Compl. ¶ 22.

The AFBCMR rendered its decision on plaintiff's resubmitted application on March 20, 2008. JA 167–72. After summarizing the additional facts and advisory opinions added to the record subsequent to its October 14, 2004 decision, with the exception of the affidavits of plaintiff and her son, the AFBCMR concluded that there was "no evidence of an error warranting corrective action in this case" and that it was not "persuaded by counsel's assertions that the applicant has been the victim of an injustice." *Id.* at 170. In support of its conclusion, the AFBCMR noted that there was no evidence of a timely, proper election of former spouse coverage under the SBP and discounted the possibility that, upon the dissolution of his marriage, TSgt Bonewell submitted the relevant portion of his Decree of Dissolution with his DD Form 2558. *Id.* Moreover, the AFBCMR concluded that "taking action 'to preclude the possibility' of an injustice" to plaintiff would "create an injustice to another"—TSgt Bonewell's widow. *Id.* In sum, the AFBCMR found that plaintiff had "failed to sustain her burden of proof regarding the existence of an error or injustice" and that the intervening case law from the Court of Federal Claims relied upon by plaintiff was distinguishable. *Id.*

Plaintiff filed the instant suit on October 20, 2008, asserting three claims for relief. In her first claim, plaintiff avers that the AFBCMR's decision denying her initial application was arbitrary, capricious, and without a basis in law and fact. Compl. ¶¶ 24–26. In her second claim, plaintiff contends that the AFBCMR's decision denying her renewed application, after the Office of the Judge Advocate General's litigation division induced her to dismiss her district court action by assuring her a favorable recommendation to the AFBCMR, was arbitrary, capricious, contrary to law and equity, in bad faith, and an abuse of discretion. *Id.* ¶¶ 27–33. In her third claim, plaintiff asserts that the Air Force acted in bad faith by inducing her to dismiss her federal court action by assuring her a favorable recommendation to the AFBCMR. *Id.* ¶¶ 34–38. As remedies, plaintiff seeks a declaration that she is the proper beneficiary of the SBP annuity; back SBP annuity payments beginning from May 1, 2003; the correction of TSgt Bonewell's Air Force records to reflect that the DFAS was timely notified of the former spouse election; attorney's fees; and "[s]uch other and further relief as the Court deems just and proper under the circumstances." *Id.* ¶¶ (1)-(5).

On December 19, 2008, defendant moved to dismiss plaintiff's complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The court denied defendant's motion in a May 26, 2009 Opinion and Order. *See Bonewell v. United States*, 87 Fed.Cl. 413 (2009). TSgt Bonewell's widow subsequently intervened in the action. Now before the court are defendant's and defendant-intervenor's RCFC 12(b)(6) motions to dismiss and the parties' cross-motions for judgment on the administrative record. The court heard argument on October 15, 2010.

## II. RCFC 12(b)(6) MOTIONS TO DISMISS

### A. Standard of Review

■ Defendant and defendant-intervenor move to dismiss plaintiff's complaint pursuant to RCFC 12(b)(6). Motions to dismiss test the sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus, in ruling on such motions, the court assumes that the allega-

tions in the complaint are true and construes those allegations in plaintiff's favor. *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995).

■■■ A complaint must contain "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief[.]" RCFC 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). Although a complaint need not contain "detailed factual allegations," the "factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Id.* In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp.,* 550 U.S. at 556, 127 S.Ct. 1955). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." [9] *Bell Atl. Corp.,* 550 U.S. at 563, 127 S.Ct. 1955. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### B. Legal Requirements for an Election of Former Spouse Coverage Under the SBP

The court must determine whether the factual allegations in plaintiff's complaint are sufficient to state a plausible claim for the SBP annuity pursuant to 10 U.S.C. § 1450(a)(1). A former spouse, such as plaintiff, can receive an SBP annuity through one of two methods: an election of former spouse coverage pursuant to 10 U.S.C. § 1448(b) or a deemed election of former spouse coverage pursuant to 10 U.S.C. § 1450(f)(3).

Under the first method, the service member bears the burden of making the election. 10 U.S.C. § 1448(b)(3)(A)(i). "Any such election must be written, signed by the person making the election, and received by the Secretary concerned within one year after the date of the decree of divorce, dissolution, or annulment." *Id.* § 1448(b)(3)(A)(iii). Further:

> A person who elects to provide an annuity to a former spouse . . . shall, at the time of making the election, provide the Secretary concerned with a written statement (in a form to be prescribed by that Secretary and signed by such person and the former spouse) setting forth—
>
> (A) whether the election is being made pursuant to the requirements of a court order; or
>
> (B) whether the election is being made pursuant to a written agreement previously entered into voluntarily by such person as a part of, or incident to, a proceeding of divorce, dissolution, or annulment and (if so) whether such voluntary written agreement has been incorporated in, or ratified or approved by, a court order.

*Id.* § 1448(b)(5). The pertinent regulation setting forth the form of the required written statement, according to the parties,[10] indicates that a service member should provide

9. In so holding, the United States Supreme Court ("Supreme Court") determined that the "no set of facts" language set forth in *Conley,* 355 U.S. at 45, 78 S.Ct. 99, "has earned its retirement," *Bell Atl. Corp.,* 550 U.S. at 563, 127 S.Ct. 1955.

10. Although 10 U.S.C. § 1448(b)(3)(A)(iii) places the responsibility for prescribing the form of the required written statement in this case on the Secretary of the Air Force, the parties do not cite any of the relevant Air Force regulations in force at the time of plaintiff's divorce from TSgt Bonewell. *See, e.g.,* Air Force Policy Directive 36–30, *Military Entitlements* (Aug. 2, 1993) (implementing, in part, Department of Defense Directive 1332.27, *Survivor Benefit Plan* (Jan. 4, 1974), which contained the regulations for the SBP); Air Force Instruction 36–3006, *Survivor Benefit*

the following information: the service member's name, social security number, birth date, and retirement date; the base amount of requested coverage; the former spouse's name, social security number, and birth date; the dates of marriage and divorce; and the signatures of both the service member and the former spouse. FMR § 430303.

Under the second method, the appropriate service must receive "[a] written request, in such manner as the Secretary shall prescribe, from the former spouse concerned requesting that such an election be deemed to have been made," and either "a copy of the court order, regular on its face, which requires such election or incorporates, ratifies, or approves the written agreement" of the service member to make an election in favor of the former spouse or "a statement from the clerk of court (or other appropriate official)" that the agreement to make the election "has been filed with the court in accordance with applicable State law." 10 U.S.C. § 1450(f)(3)(A). The Secretary must receive the "request from the former spouse ... within one year of the date of the court order or filing involved." *Id.* § 1450(f)(3)(C). The pertinent regulation, according to the parties,[11] describes what constitutes an acceptable written request: "The request is acceptable if it refers to, or cites provisions in a court order concerning SBP former

spouse coverage, or makes clear by other references to SBP that there is an intent that the coverage be provided to a former spouse." FMR § 430503(C).

### C. Plaintiff States a Claim for the SBP Annuity Upon Which This Court Can Grant Relief

Defendant and defendant-intervenor contend that because TSgt Bonewell did not strictly comply with the statutory and regulatory requirements to elect former spouse coverage and plaintiff did not strictly comply with the statutory and regulatory requirements to effectuate a deemed election of former spouse coverage, plaintiff has failed to state a claim upon which this court can grant relief. Indeed, plaintiff does not deny that neither she nor TSgt Bonewell followed the letter of the law with exacting precision. Rather, she argues that TSgt Bonewell, by submitting a DD Form 2558 and the relevant excerpt from the separation agreement shortly after the divorce, substantially complied with the legal requirements for a former spouse election. Thus, the issue before the court is whether the former spouse of a service member who allegedly substantially complied with the election requirements of 10 U.S.C. § 1448(b) and its implementing regulations states a claim for relief in the Court of Federal Claims.[12]

---

*Plan (SBP) and Supplemental Survivor Benefit Plan (SSBP) (Active, Guard, Reserve, and Retired)* ¶ 3, Attachs. 12–14 (July 1, 1996) (requiring divorced service members who elect former spouse coverage to submit a copy of the divorce decree and DD Form 2656–1); *see also* DD Form 2656–1 (Apr. 1999) (requesting the provision of the following information: the service member's name and social security number; the former spouse's name and social security number; the dates of marriage and divorce; and the signatures of both the service member and the former spouse). Instead, the parties limit their discussion to the following regulation: United States Department of Defense Financial Management Regulation 7000.14–R, vol. 7B, ch. 43 (Sept. 1999) ("FMR"). Because the information required by the Air Force regulations mirrors, in relevant part, the information required by the FMR, the court will refer to the provisions of the FMR cited by the parties.

**11.** Although 10 U.S.C. § 1450(f)(3)(A) places the responsibility for prescribing the manner of the required written request in this case on the Secretary of the Air Force, the parties do not cite any of the relevant Air Force regulations in force

at the time of plaintiff's divorce from TSgt Bonewell. *See, e.g.,* Air Force Policy Directive 36–30, *supra* note 10; Air Force Instruction 36–3006, *supra* note 10, at ¶ 3, Attach. 13 (requiring a former spouse to submit a written request for a deemed election and a copy of the divorce decree within one year of the divorce). Instead, the parties again limit their discussion to the FMR. Because the information required by the Air Force regulations mirrors, in relevant part, the information required by the FMR, the court will refer to the provisions of the FMR cited by the parties.

**12.** Because the facts of this case demonstrate that plaintiff did not submit, prior to TSgt Bonewell's death, any documentation to the Air Force that could constitute a request for a deemed election of former spouse coverage (*i.e.*, a written request, a copy of the separation agreement, or a copy of the Decree of Dissolution), there is no basis for the court to analyze whether she could state a viable claim for relief based on substantial compliance with 10 U.S.C. § 1450(f)(3).

Neither the Supreme Court nor the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has addressed whether strict compliance with 10 U.S.C. § 1448(b) and its implementing regulations is required to elect former spouse coverage. However, in other cases, the Federal Circuit and its predecessor, the United States Court of Claims ("Court of Claims"), have considered whether a party's substantial compliance with the relevant statutory or regulatory requirements provided an adequate basis for the party's claim against the United States.

For example, in *Credit Life Insurance Co. v. United States*, the Federal Circuit examined whether it was appropriate for the United States Claims Court ("Claims Court"), the immediate predecessor of the Court of Federal Claims, to rely on the doctrine of substantial compliance in a tax refund suit. 948 F.2d 723 (Fed.Cir.1991). The Claims Court had concluded that "[s]ubstantial compliance with procedural requirements in regulations [was] sufficient to invoke a tax election." *Id.* at 725. On appeal, the Federal Circuit concluded that the scope of the doctrine of substantial compliance in tax cases was "narrow" and "limited." *Id.* at 726–28. In reaching this conclusion, it expressed its agreement with the following view: " 'The common law doctrine of substantial compliance should not be allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute.' " *Id.* at 726–27 (quoting *Prussner v. United States*, 896 F.2d 218, 224 (7th Cir.1990) (en banc)). Ultimately, the Federal Circuit "decline[d] to expand the very limited scope of the substantial compliance doctrine to embrace the" facts of the case before it. *Id.* at 728.

In the government contracts arena, the Federal Circuit has concluded that a contractor's certification of a claim is valid under the Contract Disputes Act of 1978 ("CDA") so long as the contractor substantially complies with the CDA's certification requirements.[13] It first addressed the issue in *United States v. General Electric Corp.*, where it concluded that the contractor's claim, when "read in its entirety, including referenced documents," contained "the information and statements required by the statute and [was] in substantial compliance therewith." 727 F.2d 1567, 1569 (Fed.Cir.1984). Subsequently, the Federal Circuit has found substantial compliance with the CDA's certification requirements in other cases. *See, e.g., Fischbach & Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 760 (Fed.Cir.1993) ("[T]he language of [the] certification satisfies the substantial compliance test of *United States v. General Electric Corp.*, 727 F.2d 1567 (Fed.Cir.1984)"); *Heyl & Patterson, Inc. v. O'Keefe*, 986 F.2d 480, 481 (Fed.Cir.1993) ("The language of the November 21, 1989 certification satisfies the substantial compliance test set forth in *United States v. General Elec. Corp.*, 727 F.2d 1567 (Fed.Cir.1984)"), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995); *Transam. Ins. Corp., Inc. ex rel. Stroup Sheet Metal Works v. United States*, 973 F.2d 1572, 1580 (Fed. Cir.1992) ("This court has previously found that even when a proposed claim certification lacks certain elements specified in the statutory standard of 41 U.S.C. § 605(c)(1), the certification can still be valid if in 'substantial compliance' with the statute and its purposes.").

Most analogous to the present case are the Court of Claims' and Federal Circuit's discussions of parties' substantial compliance with the statutes and regulations related to death benefits and survivor annuities under the Civil Service Retirement System. The Court of Claims first applied the doctrine of substantial compliance in *Sonnabend v. United States*, 175 F.Supp. 150 (Ct.Cl.1959). In that case, the plaintiff sought a widow's survivor annuity under the Civil Service Retirement Act, which provided "that 'applications

---

**13.** The CDA requires, for claims exceeding a certain threshold amount, that the contractor certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1) (2006).

for annuity shall be in such form as the Civil Service Commission may prescribe'" and "that 'upon receipt of satisfactory evidence the Civil Service Commission shall forthwith adjudicate the claim of the applicant'...." *Id.* at 150–52 (quoting 5 U.S.C. §§ 716–717). The plaintiff's husband, upon his retirement from the civil service in 1950, "applied for and received a reduced annuity," designating "the plaintiff as the recipient of the annuity upon his death." *Id.* at 150. He was reinstated to the civil service in 1951. *Id.* Upon his second retirement from the civil service in 1953, he again "decided to apply for a reduced annuity in order to provide for plaintiff to receive a widow's annuity in the event of his death." *Id.* at 150–51. He "disclosed his intention to accept a reduced annuity to his personal physician, his family, and his fellow employees." *Id.* at 151. In addition, he "completed the application in his own handwriting" and was "awaiting a certificate from his physician" so that he could file the application. *Id.* Unfortunately, he died "before his physician's signature had been received and before his application was actually filed." *Id.*

After her application for a widow's survivor annuity was denied by the Civil Service Commission and the Board of Appeals and Review, the plaintiff filed suit in the Court of Claims. *Id.* The Court of Claims concluded:

[I]n all the circumstances as disclosed by the undisputed record in this case there was substantial compliance with the substance of the statute and regulations which provide for the granting of an annuity upon involuntary separation from the service where the applicant had more than 25 years of Government service and where such separation was not for cause, misconduct or delinquency.

*Id.* at 152. It explained:

The statute nowhere requires a written application, only 'satisfactory evidence.' The evidence of deceased's intent and of plaintiff's right is so overwhelming as to convince and satisfy anyone except a doubting Thomas. Plaintiff had retired in 1950 with a written request for and had accepted a reduced annuity. This application was never canceled. After his resto-

ration to an indefinite position, upon separation from the service he prepared a new application in his own handwriting, told his wife, his family, his fellow employees, apparently everybody except the neighborhood dogs, who probably were not interested anyway, of his intention to accept the reduced annuity. But, like Thomas, the officials wanted to feel and touch the written instrument. This is not said in criticism of the officials who passed upon this issue. They properly used every precaution to see that the rights of the Government were protected. The facts in this case, however, preclude any other reasonable conclusion than that plaintiff is fully entitled to a widow's annuity based upon 35 years of satisfactory Government service on the part of her husband. The only purpose of a written instrument is to have a satisfactory record. We are persuaded to believe that this record taken as a whole fully justifies the conclusion we have reached.

The law is not an end in itself, it is a means to an end. It is a vehicle for reaching the ends of justice. Experienced nations and civilized people have found that if the proper results are to be reached there must be reasonable interpretation of the laws. The courts always hesitate to apply a stern lettering when it runs counter to the whole stream of human experience and reaches a conclusion that no reasonable person would wish.

*Id.* at 152–53 (footnote & citation omitted). The Court of Claims accordingly awarded the plaintiff the survivor's annuity. *Id.* at 153.

The Federal Circuit has further addressed a civil service retiree's substantial compliance with the regulatory requirements pertaining to survivor annuities in *Kyles v. Office of Personnel Management,* 62 Fed.Appx. 339 (Fed.Cir.2003) (unpublished). In that case, the civil service employee, upon her retirement, elected to receive a reduced annuity "with an insurable interest survivor annuity benefit" for the petitioner. *Id.* at 340. The United States Office of Personnel Management ("OPM") advised the retiree that the law required her to confirm her election of an insurable interest survivor annuity by sub-

mitting to OPM a confirmation form along with medical documentation of her good health. *Id.*; *see also id.* at 342 (citing the applicable regulation: 5 C.F.R. § 831.613(f)). The form

> included two sections, respectively entitled "Annuity Election" and "Medical Evidence Demonstrating Good Health," and a signature line. The Annuity Election section included two check boxes, one next to the statement, "I elect a regular annuity *without providing* an insurable interest survivor benefit to [the petitioner]," and the other one next to the statement, "I elect a regular annuity *providing* an insurable interest survivor benefit to [the petitioner]." The Medical Evidence section included three check boxes with which to indicate, with regard to the medical evidence required for election, whether it: "Will not be submitted, since I wish to void my election"; "Was submitted with my retirement application"; or "Is enclosed with this confirmation letter."

*Id.* at 340. The retiree placed check marks next to "I elect a regular annuity *without providing* an insurable interest survivor benefit to [the petitioner]" and "[i]s enclosed with this confirmation letter," signed the form, and returned the form to the OPM along with a statement from her doctor attesting to her good health. *Id.* She also took other estate planning actions, including naming the petitioner as the beneficiary of a life insurance policy and her savings bonds. *Id.* at 341.

Upon the retiree's death, the petitioner applied for the survivor's annuity. *Id.* The OPM denied her application due to the retiree's failure to confirm the benefit (*i.e.*, by not checking the proper box on the confirmation form), a decision that was affirmed by the Merit Systems Protection Board. *Id.* On appeal to the Federal Circuit, the petitioner argued that the retiree's "actions, including having undergone a medical evaluation at her own expense and forwarding the results to the OPM, were inconsistent with an intent to revoke the election of the survivor annuity and 'should be considered sufficient to satisfy the election requirements' under the doctrine of substantial compliance." *Id.* The Federal

Circuit concluded that the Merit Systems Protection Board's decision was supported by substantial evidence, noting that "the balance of the evidence is near equipoise or perhaps might even be tilted slightly in favor of" the petitioner. *Id.* at 342. Nevertheless, it remarked:

> The evidence of record indicates to us that [the retiree] might have simply made a mistake and checked the wrong box, and that she might have intended to confirm her election of an insurable interest survivor annuity benefit for [the petitioner]. Consequently, we might have decided this case in [the petitioner]'s favor if we were a court of first instance.

*Id.* In sum, the Federal Circuit accepted the applicability of the doctrine of substantial compliance in survivor annuity cases, but determined that, given the standard of review on appeal, it would not set aside the decision of the Merit Systems Protection Board. *Id.*

The Federal Circuit, in a pair of unpublished decisions, has also addressed civil service employees' compliance with the statutory requirements pertaining to the Civil Service Retirement System lump-sum death benefit. In both cases, the relevant statute provided that a beneficiary designation form was effective only if the OPM received the form prior to the employee's death. *See* 5 U.S.C. § 8342(c) (2006) ("Lump-sum benefits ... shall be paid ... to the beneficiary or beneficiaries designated by the employee or Member in a signed and witnessed writing received in the Office before his death."). In *Petersen v. Office of Personnel Management,* the employee filled out the beneficiary designation form and delivered it to the personnel office of his employing agency. 16 F.3d 422, 422 (Fed.Cir.1993) (table). Rather than forwarding the form to the OPM, the agency filed it in the employee's personnel file. *Id.* Upon the employee's death, the agency forwarded the form to the OPM "with a letter explaining the mistake and urging that the designation be accepted." *Id.* The OPM declined to change the beneficiary and Merit Systems Protection Board upheld that decision. *Id.* On appeal to the Federal Circuit, the proposed beneficiary argued that the employee

had substantially complied with the statute by delivering the form to his employing agency. *Id.* The Federal Circuit disagreed, holding that the statute "explicitly requires the designation form to be *received by* OPM prior to the employee's death." *Id.* It therefore affirmed the decision of the Merit Systems Protection Board.

Similarly, in *Davis v. Office of Personnel Management,* the employee filled out the beneficiary designation form and provided it to his employing agency. 168 F.3d 1316, 1316 (Fed.Cir.1998) (table). However, the OPM did not receive the form until more than two months after the employee died. *Id.* The OPM denied the proposed beneficiary's application for the lump-sum death benefit and the Merit Systems Protection Board affirmed. *Id.* On appeal, the Federal Circuit held:

> Here, the statute expressly specifies that OPM itself must receive the written designation before the employee's death in order for it to be effective. No authority is given to OPM to establish an agent or to provide some alternate location for receipt of the designation forms or to waive the deadline, the date of death. Therefore, under the express terms of section 8342(c), OPM has no discretion to pay benefits to anyone other than the properly designated beneficiary on file with OPM itself at the time of the employee's death, regardless of the employee's intent or receipt of the designation form by representatives of another agency. As stated in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 432 [110 S.Ct. 2465, 110 L.Ed.2d 387] (1989 [1990] ), the express terms of a statute cannot be ignored based on the facts of individual cases. [The petitioner]'s argument on this issue must fail.
>
> . . . .
>
> Although we are sympathetic to [the petitioner]'s arguments, we are bound by the statutory prerequisites to entitlement set forth in section 8342(c). Therefore, we conclude that receipt of the designation form by the employing agency representatives cannot be considered substantial compliance with the statute, nor can the employing agency be considered the agent of

OPM, nor are the circumstances beyond the scope of the statutory and regulatory requirements.

*Id.*

■ Given this precedent, the court in the instant case holds that a plaintiff who alleges substantial compliance with 10 U.S.C. § 1448(b) has stated a claim upon which relief can be granted. There is no question that the Federal Circuit accepts the application of the doctrine of substantial compliance with statutes and regulations in cases alleging claims against the United States. In tax cases, it will apply the doctrine when the taxpayer has a good excuse for failing to comply with an unimportant, unclear, or confusing requirement. *Credit Life Ins. Co.,* 948 F.2d at 726–27. In CDA cases, it applies the doctrine when the contractor's claim, read in its entirety, includes information sufficient to constitute the required certification. *Gen. Elec. Corp.,* 727 F.2d at 1569; *Fischbach & Moore Int'l Corp.,* 987 F.2d at 762–63; *Heyl & Patterson, Inc.,* 986 F.2d at 483–85; *Transam. Ins. Corp., Inc.,* 973 F.2d at 1579–81. In civilian survivor annuity cases, its predecessor has applied, and it has positively acknowledged, the doctrine when a retiree's intent to apply for an annuity was clear, despite the retiree's failure to fully comply with the relevant law. *Kyles,* 62 Fed.Appx. at 341–42; *Sonnabend,* 175 F.Supp. at 152–53. And, although the Federal Circuit rejected the application of the substantial compliance doctrine in two civilian lump-sum death benefit cases, holding that delivery of a beneficiary designation form to the employing agency was insufficient to comply with the statutory requirement that a beneficiary designation form be received at the OPM, it did not affirmatively define what constituted receipt by the OPM, leaving open the possibility that an employee could substantially comply with the statute in another way. *Davis,* 168 F.3d at 1316; *Petersen,* 16 F.3d at 422.

Further support for the application of the substantial compliance doctrine is found, as Federal Circuit precedent instructs, through an examination of the underlying purposes of 10 U.S.C. § 1448(b)'s former spouse election requirements. *See, e.g., Fischbach &*

*Moore Int'l Corp.*, 987 F.2d at 763 (looking to the purpose of the CDA's certification requirement, remarking that "[t]here is no indication that Congress was concerned with degrees of strength in the wording of the certification" and that "[t]he legislative history shows Congress was simply concerned to bind the contracting organization in fraud and contract"); *Transam. Ins. Corp., Inc.*, 973 F.2d at 1580 ("This court has previously found that even when a proposed claim certification lacks certain elements specified in the statutory standard of 41 U.S.C. § 605(c)(1), the certification can still be valid if in 'substantial compliance' with the statute and its purposes."); *Credit Life Ins. Co.*, 948 F.2d at 727–28 (finding that the taxpayer could not have substantially complied with the relevant regulation because the actions it took did not fulfill the purposes of the regulation). Congress added the former spouse election requirements to section 1448(b) in two amendments to the SBP. First, the requirements that the election be in writing, signed by the service member, and submitted to the appropriate Secretary within one year of the divorce were added to the statute in 1983. *See* Department of Defense Authorization Act, 1984, Pub.L. No. 98–94, § 941(a)(2), 97 Stat. 614, 652–53 (1983) (amending 10 U.S.C. § 1448(b) (1982)). These new requirements were part of an effort by Congress to clarify that service members who retired before the enactment of the SBP could make a former spouse election if they chose to participate in the SBP upon retirement and that service members who retired after the enactment of the SBP could change their current election to a former spouse election. H.R.Rep. No. 98–352, at 231 (1983) (Conf. Rep.). There is nothing in the legislative history that indicates how the new procedural requirements furthered Congress's goal, but, practically speaking, it appears that the requirements were meant to provide the military with prompt and formal notice of the service member's intent to elect former spouse coverage.

Second, Congress added the requirement that the former spouse sign the written statement setting forth whether the election was being made pursuant to a court order or a voluntary agreement in 1982 as part of its effort to abrogate the effect of a then-recent Supreme Court decision that prohibited the treatment of military retired pay as divisible property during divorce proceedings.[14] Uniformed Services Former Spouses' Protection Act § 1003(b)(2); H.R.Rep. No. 97–749, at 165 (1982) (Conf. Rep.) ("This provision in the House amendment would have the effect of reversing the decision of the United States Supreme Court in the case of *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981)...."); S.Rep. No. 97–502, at 1 (1982) ("The primary purpose of the bill is to remove the effect of the United States Supreme Court decision in *McCarty* ...."). Nothing in the amendment's legislative history indicates why the former spouse's signature was required to further this general goal. *See, e.g.,* S.Rep. No. 97–502, *supra,* at 1–12, 23–25; H.R.Rep. No. 97–749, *supra,* at 165–68. More particularly, with respect to the SBP provisions of the amendment, Congress indicated that their purpose was to allow eligible individuals "to provide a measure of financial protection to a former spouse in the event of termination of a marriage." S.Rep. No. 97–502, *supra,* at 24. The legislative history is again silent as to how the former spouse signature requirement would further this goal. Indeed, the explanation of the new SBP provisions in the Senate Report omits any mention of the signature requirement. S.Rep. No. 97–502, *supra,* at 24 (explaining that the individual electing former spouse coverage is required to "provide to the Secretary concerned a written statement setting forth whether the election is being made pursuant to a voluntary written agreement between the parties, and if so, whether such agreement has been incorporated in, ratified or approved by a court order"). Thus, the only reason that

---

14. The language of the former spouse signature requirement that Congress first enacted is substantially similar to the language of the requirement in effect when plaintiff and TSgt Bonewell divorced. *See* Uniformed Services Former Spouses' Protection Act § 1003(b)(2) ("Any person who elects ... to provide an annuity to a former spouse shall ... provide the Secretary concerned with a written statement ... signed by such person and the former spouse ....").

the court can discern for the former spouse signature requirement is to provide assurances to the military that the former spouse is aware that the service member carried out the terms of their property settlement agreement.[15] In other words, the requirement is for the benefit of the military, not the service member or the former spouse.[16] It therefore appears that the requirement that the former spouse sign the written statement is not critical to the goal of providing a "measure of financial protection to a former spouse in the event of termination of a marriage." In sum, the legislative history does not reflect that Congress intended to require strict compliance with 10 U.S.C. § 1448(b) to elect former spouse coverage.

■ Plaintiff here has alleged that TSgt Bonewell substantially complied with 10 U.S.C. § 1448(b) by submitting to the DFAS, within a year of their divorce, a signed DD Form 2558 indicating that he was making an allotment pursuant to a "court ordered divorce settlement," a copy of the court order setting a hearing date for the couple's divorce, and a page from the couple's separation agreement indicating that "[t]he pension and retirement accounts will be divided as follows: Wife shall receive $472.54 per month of Husband's Air Force Retirement and SSP [sic] benefits." The court cannot say that it is not possible for plaintiff's allegations to constitute substantial compliance with the requirements of section 1448(b)(3)(A)(iii). The court acknowledges that plaintiff has not alleged that she signed the DD Form 2558 along with TSgt Bonewell. Nevertheless, because strict compliance with this requirement is not mandated, the court is not prepared to

conclude, taking TSgt Bonewell's submission to the DFAS as a whole, that there was not substantial compliance with the former spouse signature requirement of section 1448(b)(5).

Further, because the court has determined that a plaintiff who alleges substantial compliance with 10 U.S.C. § 1448(b) has stated a viable claim for relief, it follows that a plaintiff who alleges substantial compliance with section 1448(b)'s implementing regulations has also stated a viable claim for relief. Plaintiff here has alleged substantial compliance with the relevant regulations.[17] Accordingly, she has stated a claim upon which this court could grant relief.

### III. CROSS–MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The parties have each filed a motion for judgment on the administrative record, seeking to either uphold or overturn the AFBCMR's October 14, 2004, and March 20, 2008 decisions declining to correct TSgt Bonewell's military record as plaintiff requested. In ruling on a motion for judgment on the administrative record, the court makes "factual findings ... from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1357 (Fed.Cir.2005);[18] *see also id.* at 1356 ("[J]udgment on the administrative record is properly understood as intending to provide for an expedited trial on the administrative record."). In general, "review of a military corrections board is limited to the administrative record[.]" *Walls,* 582 F.3d at 1368. *But see id.* at 1376 (Newman,

---

**15.** A former spouse's signature could not serve to assure the former spouse that the service member carried out the terms of their property settlement agreement because the service member would still be required to take the additional step of submitting the written statement to the military.

**16.** Indeed, former spouses who are uncertain whether the service member has elected former spouse coverage are entitled to submit an application for a deemed election of former spouse coverage under 10 U.S.C. § 1450(f)(3).

**17.** Plaintiff certainly could not assert strict compliance with the regulations, as certain information required to be in the written statement (TSgt

Bonewell's retirement date, the amount of coverage TSgt Bonewell was electing, plaintiff's birth date and social security number, the couple's marriage and divorce dates, and plaintiff's signature) was not included in TSgt Bonewell's submission to the DFAS. *See* FMR § 430303.

**18.** The decision in *Bannum* was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1, however, was designed to incorporate the decision in *Bannum. See* RCFC 52.1, Rules Committee Note (June 20, 2006).

J., dissenting) ("The rule permitting augmentation of the administrative record on judicial review of a decision of a military correction board is the law of this circuit." (citing *Brown v. United States,* 396 F.2d 989 (Ct.Cl. 1968))).

In this case, the court is confronted with a situation where the correction board did not consider evidence submitted by the applicant. Plaintiff submitted two affidavits to the AFBCMR on March 5, 2007, but the AFBCMR did not consider that evidence in rendering its March 20, 2008 decision. *See* JA 167–71. Plaintiff has submitted these affidavits to the court in support of her case. *See* Compl. Ex. 4 at 2–4. Given the Federal Circuit's direction in *Walls* that this court should not consider de novo evidence in reviewing the decisions of military correction boards, 582 F.3d at 1368, the court is compelled to remand the case to the AFBCMR to consider all of the evidence, including the affidavits, and render a new ruling.

## IV. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's and defendant-intervenor's motions to dismiss and **DENIES** the parties' cross-motions for judgment on the administrative record. The court **RE-MANDS** the case to the AFBCMR for prompt reconsideration of plaintiff's application, with the following instructions:

- The remand period shall terminate on **Wednesday, May 4, 2011.** The court **STAYS** proceedings in the instant case during that time. If the AFBCMR has not issued a decision by May 5, 2011, the parties shall follow the procedures set forth in RCFC 52.2(d).

- In its inquiry, the AFBCMR shall (1) obtain new advisory opinions that assume that TSgt Bonewell submitted part of his Decree of Dissolution to the DFAS in May 2001 with his DD Form 2558; (2) consider all of the evidence that was submitted by plaintiff, including her affidavit and the affidavit of her son; (3) decide whether TSgt Bonewell substantially complied with 10 U.S.C. § 1448(b) and explain why or why not; and (4) decide whether, given the thirty-two-year

marriage between plaintiff and TSgt Bonewell and TSgt Bonewell's specific intent to provide the SBP annuity to plaintiff, equity demands a correction be made to remove an injustice to plaintiff, and explain why or why not.

- Pursuant to RCFC 52.2(b)(1)(D), defendant shall file a status report **no later than Wednesday, February 2, 2011,** indicating the status of the proceedings before the AFBCMR.

- When proceedings before the AFBCMR have concluded, the AFBCMR shall forward four copies of its decision to the clerk of the Court of Federal Claims pursuant to RCFC 52.2(e). The parties shall then file, **within thirty days** of the filing of the AFBCMR's decision, the notices required by RCFC 52.2(f)(1).

**IT IS SO ORDERED.**